# United States Tax Court

T.C. Memo. 2025-45

KIRK STEVENS AND SHANNON STEVENS,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 2824-20.                                    Filed May 15, 2025.

————

*Brian R. Harris* and *Matthew J. Mueller*, for petitioner Kirk Stevens.

*Michelle F. Schwerin*, for petitioner Shannon Stevens.

*Luke D. Ortner* and *Patrick A. Greenleaf*, for respondent.

## TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 2

FINDINGS OF FACT .......................................................... 4

OPINION................................................................... 33

I.   Petitioners bear the burden of proof (except that respondent has the burden of production as to whether the underpayments are due to negligence and whether the penalties were approved in writing by the appropriate supervisor). .................................................. 33

II.  The issue in this case is whether the 2014 and 2016 notes constitute true indebtedness. ....................................... 34

III. In considering whether the 2014 and 2016 notes are true indebtedness, we need not analyze the operation of the provisions of the 2014 note and the 2014 option agreement. ....... 35

**Served 05/15/25**

**[*2]**

IV. The 2014 and 2016 notes are not true indebtedness. ................... 40

    A. The duration-gap scenario, under which SLS will call the option but the 2016 note will remain outstanding, is nonexistent. ..................................................................... 41

    B. Petitioners' comparison to a Formosa bond does not convince us that there exists a duration-gap scenario. ......... 43

    C. The portion of the 2016 option agreement that models an interest-rate cap does not make the 2016 note true indebtedness. ...................................................................... 44

V. Petitioners are liable for penalties. .............................................. 45

    A. Petitioners were negligent with respect to the underpayments for 2014, 2015, and 2016 and did not have reasonable cause for claiming the disputed interest deductions. ............................................................................ 45

    B. The penalties were approved in writing by the appropriate supervisor. .......................................................... 47

        1. The initial determination to impose the penalties was made by Battaglino. ................................................. 48

        2. The approval of the penalties by Battaglino's supervisor, Biggerstaff, was timely, even though it occurred after the Letter 5153, because it occurred before the Notices of Deficiency while Biggerstaff still had discretion to approve the penalties. ................. 49

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, *Judge*: Respondent mailed two Notices of Deficiency to petitioners on November 22, 2019. By the first Notice of Deficiency, respondent determined deficiencies with respect to petitioners' joint income tax liabilities for tax years 2014, 2015, and 2016. For tax year 2014 the first Notice of Deficiency disallowed $6,142,838 of interest deductions and determined a deficiency of $1,466,197 and a 40% penalty

[*3] under section 6662(a) and (i)(1)[1] of $586,478.80. We assume, without deciding, that the first Notice of Deficiency also determined that the underpayment for the year was attributable to negligence or disregard of rules and regulations under section 6662(b)(1). *See infra* note 19. For tax year 2015 the first Notice of Deficiency disallowed $20,238,527 of interest deductions and determined a deficiency of $3,322,459 and a 20% penalty under section 6662(a) and (b)(1) of $664,491.80. For tax year 2016 the first Notice of Deficiency disallowed $7,808,135 of interest deductions, made an $89,599 upward adjustment to income without specifying the item on the return to which the adjustment pertained, and determined a deficiency of $132,493 and a 20% penalty under section 6662(a) and (b)(1) of $26,498.60. By the second Notice of Deficiency, respondent determined petitioners were liable for a section 6676(a) penalty of $111,288.80 for tax year 2013. Petitioners filed a timely Petition for redetermination as to the two Notices of Deficiency. Respondent's Answer asserted a 20% penalty under section 6662(a) and (b)(1) for 2014. Respondent's Pretrial Memorandum conceded that for tax year 2014 petitioners are not liable for the 40% penalty under section 6662(a) and (i)(1), a theory of penalty liability that had been determined in the first Notice of Deficiency.

We have jurisdiction over the above-described determinations in the Notices of Deficiency and the above-described assertion in the Answer:

- We have jurisdiction to redetermine the deficiencies for 2014, 2015, and 2016. Our jurisdiction over these matters is founded on section 6213(a) (granting the Tax Court jurisdiction to redetermine deficiencies in tax upon the filing of a petition).

- We have jurisdiction over petitioners' liability for the section 6676(a) penalty for 2013, the 40% penalty under section 6662(a) and (i)(1) for 2014, the 20% penalty under section 6662(a) and (b)(1) for 2015, and the 20% penalty under section 6662(a) and (b)(1) for 2016. Our jurisdiction over these matters is founded on sections 6213(a) and 6665(a)(1) (providing that certain liabilities, including those imposed by

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*4]**      sections 6662(a) and 6676(a), are generally treated the same as taxes).

- We have jurisdiction over petitioners' liability for the penalty under section 6662(a) and (b)(1) for 2014. Assuming that the penalty under section 6662(a) and (b)(1) for 2014 was determined by the first Notice of Deficiency, then our jurisdiction as to this penalty is founded on sections 6213(a) and 6665(a)(1). If instead this liability was first asserted in the Answer, our jurisdiction as to this liability is founded on section 6214(a). *See Kramer v. Commissioner*, T.C. Memo. 2012-192, 2012 WL 2865832, at \*3.

Our conclusions are as follows:

- For tax year 2014 respondent properly disallowed $6,142,838 of interest deductions.

- For tax year 2015 respondent properly disallowed $20,238,527 of interest deductions.

- For tax year 2016 respondent properly disallowed $7,808,135 of interest deductions.

- We do not sustain the other, unspecified, adjustment to income for the tax year 2016 of $89,599.

- Petitioners are liable for 20% penalties under section 6662(a) and (b)(1) for tax years 2014, 2015, and 2016.

- Petitioners are not liable for a 40% penalty under section 6662(a) and (i)(1) for tax year 2014.

- Petitioners are liable for a section 6676(a) penalty for tax year 2013.

FINDINGS OF FACT

Petitioners resided in California when they filed their Petition.

The Kirk and Shannon Stevens Revocable Trust (Revocable Trust) is a grantor trust, the income of which passes through to petitioners. The Revocable Trust owned 100% of One Stop Logistics, Inc.

[*5] (One Stop Logistics).  One Stop Logistics was a subchapter S corporation that operated a transportation-brokerage business.

In 2013 petitioners were approached by Echo Global Logistics, Inc. (Echo Global Logistics), which wanted to buy the transportation-brokerage business operated by One Stop Logistics.  Petitioners began negotiating the sale of the business.  They were assisted by their local California attorneys at the law firm of Hudson Martin.  The managing partner of Hudson Martin was Jeanette Witten.

Witten recommended that petitioners hire Jonathan Gopman of the law firm Akerman LLP, in Tampa, Florida.  Gopman was a tax attorney specializing in trusts and estates.  Petitioners hired Gopman.

Gopman referred petitioners to a financial consultant named Jaime Dermody.[2]  Petitioners hired Dermody.

Dermody had designed a transaction for the use of his clients.  The Dermody transaction had two parties: (1) an investor, who was a Dermody client; and (2) an issuer.  As part of the Dermody transaction, the issuer would ostensibly lend a large sum of money to the investor.  The investor would simultaneously apply the proceeds of that loan to buy an option from the issuer.  The option would, upon exercise, entitle the investor to a payment from the issuer equal to the balance of the loan.  The option also had a feature that would, upon exercise, require the issuer to make a payment to the investor if the market rate of interest at various times exceeded certain thresholds.  The investor paid for this feature of the option using cash financing that was separate from the loan.  Except for this feature of the option, the Dermody transaction had no economic effect.

In January 2014 Dermody began communicating with petitioners.  These communications soon began to focus on the following subjects: (1) the Dermody transaction, (2) the interest deductions to be claimed on the loan involved in that transaction, and (3) the usefulness of these deductions in offsetting the income that would be realized from the sale of the transportation-brokerage business.  These subjects were

---

[2] There is an error in the trial transcript that resulted in the duplication of portions of the testimony of two witnesses: Dermody and Peter Orth.  The transcription of Dermody's full testimony appears at 1125:9 to 1180:20.  The transcription of Orth's full testimony appears at 1050:7 to 1096:13.  A portion of Dermody's testimony is duplicated at 1099:8 to 1119:8.  A portion of Orth's testimony is duplicated at 1119:19 to 1125:8.

[*6] discussed in a February 11, 2014, meeting between Dermody and petitioners. Gopman participated in this meeting. After this meeting, Gopman sent Witten an email containing the following sentence: "If we can get the structure in place before the end of June, that will provide a significant amount of time to accrue the deductions that Kirk and Shannon will need to offset the gain on the sale." Gopman copied the Stevenses on this email.

In April 2014 One Stop Logistics was renamed SLS International Holdings, Inc. (SLS). The renaming was related to the impending sale of the transportation-brokerage business.

On April 17, 2014, Gopman emailed Dermody asking him what Dermody had done to "push this matter along," by which Gopman was referring to the Dermody transaction. On the same day, Dermody responded that he had "the broker dealer and two investment banks ready to do the trade."

On April 28, 2014, Hedge Red, LLC (Hedge Red), was organized as a limited liability company under Delaware law. The sole owner of Hedge Red was MVP Financial, LLC (MVP), a limited liability company that was registered with the Financial Industry Regulatory Authority as a broker-dealer. MVP was wholly owned by Steven Pearlstein. Hedge Red's organizational documents stated that Hedge Red was created solely to (1) issue a Bermuda call option to SLS under "that certain Bermuda Call Option Agreement with [MVP] and [Hedge Red] . . . dated on or about the date herein" and (2) fulfill its obligations under that agreement. The option agreement referred to in Hedge Red's organizational documents would eventually be executed on August 29, 2014.

On May 8, 2014, Gopman emailed Kirk Stevens to urge him to implement the Dermody transaction as quickly as possible after the sale of the transportation-brokerage business. Gopman explained that if petitioners procrastinated, they should simply plan on "paying the tax" from the sale of the transportation-brokerage business.

On May 12, 2014, SLS sold to Echo Global Logistics the assets of the transportation-brokerage business. The total sale price for the assets of the transportation-brokerage business was $37,551,081. The assets sold included the business name "One Stop Logistics." Of the $37,551,081 sale price, $36,199,752 was for intangible assets and was payable in installments. SLS received an installment payment of

**[*7]** $18,672,022 for the intangible assets in 2014. SLS received an installment payment of $17,507,500 for the intangible assets in 2015. The record does not reveal whether, or in what years, SLS received the remaining $20,230 of installment payments for the intangible assets.

In July 2014 Shannon Stevens became concerned with the risk of tax penalties if SLS engaged in the Dermody transaction and claimed interest deductions related to it. Shannon Stevens was the longtime owner and operator of her own accounting firm. She had substantial experience preparing tax returns for individuals and small businesses. She discussed with both Dermody and Witten her concern about tax penalties.

On July 29, 2014, Dermody sent Shannon Stevens a sample tax opinion letter relating to a transaction of a different type from the Dermody transaction. Dermody recommended that she obtain a tax opinion letter about the Dermody transaction.

On July 30, 2014, Gopman spoke to Witten and recommended to Witten that petitioners obtain a tax opinion letter from Jeffrey Rubinger, a tax attorney.

On July 30, 2014, Witten emailed Shannon Stevens with a copy to Kirk Stevens and Gopman. Witten recommended that petitioners obtain a tax opinion letter for their "protection." Witten stated that a tax opinion letter could be obtained from Rubinger "for a reasonable price." In a separate communication with Shannon Stevens, Witten specifically suggested that a tax opinion letter could be obtained from Rubinger for $10,000.

On August 1, 2014, Shannon Stevens emailed Gopman with a copy to Kirk Stevens and Witten. Shannon Stevens explained that she had heard from Witten that a tax opinion letter could be obtained from Rubinger for $10,000 and that if this was the case to "please proceed."

On August 1, 2014, Gopman emailed Shannon Stevens with a copy to Kirk Stevens and Witten. Gopman stated that $10,000 was probably not an accurate estimate of a fee for the tax opinion letter. He stated that he could not "ever see an opinion letter being written at that price—at least one that is worth anything from a quality firm." He stated that his "thought process" was to "attempt to negotiate" the fee "down to $25,000 to $35,000."

[*8]  On August 1, 2014, Witten emailed Gopman with a copy to petitioners.  She apologized for underestimating the fee for a tax opinion letter.  She asked Gopman to "find out definitely" what Rubinger would charge.

On August 4, 2014, Shannon Stevens emailed Gopman with a copy to Kirk Stevens and Witten.  Shannon Stevens stated that "we need an opinion letter."  She further explained: "I would want a quality firm that I could fall back if there ever was a problem."

On August 4, 2014, Witten emailed Shannon Stevens with a copy to Kirk Stevens and Gopman.  Witten stated that she agreed with Shannon Stevens's last email.  Witten stated that an important part of the transaction was a legal opinion "for your protection."

On August 4, 2014, Gopman emailed Shannon Stevens and Witten with a copy to Kirk Stevens.  Gopman affirmed that an "important component[] to move forward with this transaction" is a "[l]egal opinion from a qualified attorney and firm."

On August 7, 2014, Gopman emailed Kirk Stevens regarding the fee to be paid to Rubinger.  Gopman wrote: "Budget $35k to $40k for the opinion letter.  I asked for the price for you as a favor from Jeff Rubinger.  That is the best I can get it to and it is a very good deal.  I am assuming that is what he will put into his engagement letter."

On August 25, 2014, SLS executed a retainer agreement with Rubinger under which it agreed to pay him $40,000 in legal fees.

On August 29, 2014, SLS entered into a promissory note with Hedge Red (2014 note).  Under the terms of the 2014 note, SLS promised to pay Hedge Red the principal amount of $99 million, plus interest, on January 1, 2016.  The 2014 note's effective date was August 29, 2014.  The 2014 note provided that "[i]nterest shall accrue on this Note at a rate of . . . 4.5% . . . per quarter . . . , compounded quarterly on the first day of each quarter on the basis of the actual number of days in a quarter . . . until the cancellation of this Note."  The 2014 note required no payments of principal or interest before the note's maturity date of January 1, 2016.  However, the 2014 note permitted SLS to prepay principal and interest, subject to a prepayment penalty.  A provision of the 2014 note stated that the note was issued by SLS to Hedge Red "as partial payment for the Bermuda Call Option . . . described in that certain Bermuda Call Option Agreement . . . of even date herewith"

[*9] among SLS, Hedge Red, and MVP.[3] As discussed below, SLS, Hedge Red, and MVP would on the same day execute a "Bermuda Call Option Agreement." The following provisions of the 2014 note relate to that call option agreement and to the call option created by the agreement: First, the 2014 note provided that Hedge Red had a security interest in the call option that secured SLS's debt to Hedge Red under the 2014 note; second, the 2014 note provided that SLS was liable for the 2014 note only to the extent of this security interest; third, the 2014 note provided that Hedge Red had no recourse against any of SLS's assets other than through Hedge Red's security interest in the call option.

On August 29, 2014, SLS executed a Bermuda call option agreement (2014 option agreement) with Hedge Red and MVP.

Section 2.1.2 of the 2014 option agreement defined Date.0 as August 29, 2014, and defined Date.1 through Date.120 as the first date of each of the respective subsequent 120 full calendar quarters starting after August 29, 2014. It would seemingly follow that Date.1 is October 1, 2014, and that Date.120 is July 1, 2044. However, section 2.1.1 of the 2014 option agreement defined Date.120 as October 1, 2044. Thus, the 2014 option agreement is inconsistent as to whether Date.120 is July 1, 2044, or October 1, 2044.

The "Call" was defined by the preamble of the 2014 option agreement as "that certain Bermuda call option, specified in Section 2 hereof." Section 2.2 of the 2014 option agreement established SLS's "right . . . to exercise the Call" on any date in the set of Date.6 through Date.120. Section 2.1.2 of the 2014 option agreement defined Quarter $k$ as the calendar quarter starting on Date.$k$. Section 2.1.2 of the 2014 option agreement defined Date.$k$ as the date for which SLS exercised the call option.

The 2014 option agreement provided: "Settlement occurs on 'Date.Set', which is the Issuer's [i.e., Hedge Red's] choice of any of the 10 business days following the Holders [i.e., SLS's] exercise on a Date.$k$."

---

[3] A call option is the right to buy an asset for a specified price on a specified date or dates. To invoke this right is to "exercise" the option. An option allowing for exercise on only one predefined date is referred to as a European option. An option allowing for exercise on any date within a range of dates is referred to as an American option. An option allowing for exercise on any date from a set of discretely spaced dates is referred to as a Bermuda option.

**[\*10]** Section 2.6 of the 2014 option agreement provided that "if [SLS] exercises the Call on a Date.*X*" then Hedge Red "shall at its sole discretion elect (a.) a settlement date (the 'Date.Set' or 'Settlement Date'), on one of the 10 Business Days following Date.*X*; and (b.) Physical Settlement specified in Section 2.6.1, or Cash Settlement specified in Section 2.6.2."

Section 2.6.1 of the 2014 option agreement contained the following provisions regarding Hedge Red's physical-settlement election:

> If Issuer [Hedge Red] elects Physical Settlement, then on Date.Set:
>
> > 2.6.1.1 Issuer shall deliver to Holder [i.e., SLS] the face amount of bonds specified in Section 2.3 of the type or types specified in Section 2.5. Holder shall post collateral, free and clear of all liens and encumbrances, for the benefit of Issuer and maintain that collateral until the following are paid in full: (a.) SPRICE.*X* specified in Section 2.4, and (b.) any principal and interest due on any Holder's debt to Issuer ("Holder Debt"). This collateral shall: (a.) consist of U.S. dollar funds and/or bonds specified in Section 2.5; and (b.) have face amount (the "Collateral Amount") equal to the SPRICE.*X*, plus any Holder Debt that will be outstanding on Date.(*X*+8) in the absence of prepayment; and
> >
> > 2.6.1.2 Holder shall pay SPRICE.*X* to Issuer on Date.(*X*+8).

The obligation under section 2.6.1.2 of SLS to pay the strike price was reiterated in section 2.1.2. That provision was: "Holder's [i.e., SLS's] payment of Strike Price SPRICE.*X* for any bonds physically delivered is made eight quarters after Date.*X* on 'Date.(*X*+8).'"

Section 2.6.2 of the 2014 option agreement contained the following provisions regarding Hedge Red's cash-settlement election:

> If Issuer [Hedge Red] elects Cash Settlement, then on Date.Set, Issuer shall pay to Holder [SLS] the Collateral Amount, discounted back across the period from Date.(*X*+8) to Date.*X* by the Overnight Index Swap Rate for that period observed on Date.*X*. Note that if this amount is negative, then Holder shall pay to Issuer the magnitude of this negative amount. The Parties acknowledge and agree that the Cash Settlement satisfies all obligations of Issuer and Holder associated with the Call and any such debt that is part of the Collateral Amount. Under Cash Settlement, Holder shall have no obligation to make any separate payment of any Strike Price or Holder Debt, and shall have no obligation to post any collateral after Cash Settlement.

**[*11]** Section 2.3 of the 2014 option agreement stated that the "face amount of bonds to be delivered in the bundle of bonds (the 'Bundle') that is delivered in a Physical Settlement of Call, or used to compute a Cash Settlement of Call, is calculated as follows." What "follows" this statement are the provisions of sections 2.3.1. and 2.3.2, which we discuss below.

Section 2.3.1 of the 2014 option agreement contained the following provisions regarding the calculation of the face amount of bonds if SLS calls the option on its expiration date:

> If Holder [i.e., SLS] exercises on the Expiry Date (i.e. at Date.120), then the face value of bonds in Bundle is the sum, $B.X =$ Bq.1+Bq.2+Bq.3+...+Bq.120 of quarterly amounts, where:
>
> Bq.1 = \$11,200,000 F.k. for $k$ = 1, 2, 3, ... 6 and F.1 = 7.922824, F.2 = 8.259544, F.3 = 8.610575, F.4 = 8.976524, F.5 = 9.358027, and F.6 = 9.755743; and
>
> $Bq.k = F6(1.015)^{k-6} + \$11,200,000(C.k/360)D(O.k-8\%)(1+OIS.k)^{120-k}$ for k=7,8,9, ... ,120,
>
> > where $C.k$ = actual number of days in Quarter $k$,
> >
> > D=1 if $O.k$>8%, and D=0 otherwise.[1]
> >
> > [1] In Ba.120, we have $k$=120 and thus, the growth is for (120–$k$) = 0 quarters. Since any non-zero number to the 0 power is 1, the second term on the right side of the equation for Bq.k is \$11,200,000 (C.120/360)D(O.120-8%).

It appears that F6, a variable in the formula for Bq.$k$, should have been F.6. It appears that Ba.120 in note 1 should have been Bq.120.

$O.k$ is defined in the 2014 option agreement as the three-month Libor observed on Date.$k$.

$OIS.k$ is defined in the 2014 option agreement as the "Overnight Index Swap rate from Date.$k$. to Date.120 observed on Date.$k$."

The variables Bq.2, Bq.3, Bq.4, Bq.5, and Bq.6 are undefined in the 2014 option agreement. This omission renders the formula for bond value in section 2.3.1 of the 2014 option agreement incoherent.

**[\*12]** Section 2.3.2 of the 2014 option agreement contained the following provisions regarding the calculation of the face amount[4] of the bonds if SLS calls the option before its expiration date:

> If Holder [SLS] exercises on some Date.$X$ before Date.120, then the face amount of bonds in Bundle is B.$X$, which is the sum:
>
> (a.) B.$X$=Bq.1+Bq.2+Bq.3+…+Bq.$X$, where D=0 in each such Bq.$k$, for k=6,7,8,…,120; plus
>
> (b.) The mid-market Cash Price value (as defined in the 2006 ISDA Definitions pursuant to a 2002 ISDA Master Agreement), of the Instruments specified in Section 6.1.1.

The failure of the 2014 option agreement to define Bq.2, Bq.3, Bq.4, Bq.5, and Bq.6 renders the formula for bond value in section 2.3.2 of the 2014 option agreement incoherent.

> Section 2.4 of the 2014 option agreement provided:

> If [SLS] exercises on a Date.$X$ for any $X$ = 6, 7, 8, … 120, then the Strike Price associated with that exercise is "SPRICE.$X$", which equals SPRICE.120, discounted at 1.5% from Date.120 back to Date.$X$, i.e. SPRICE.$X$=$99,918,000/(1.015)^{120-X}$.  At $X$=120, this (120–$X$) = 0 as in Footnote 1 above, i.e., there is no discounting.

Section 2.5 of the 2014 option agreement provided that "the bonds in Bundle shall consist of debt maturing on or before Date.($X$+8)." Section 2.5 also required the bonds to meet certain requirements regarding credit quality and issuer.

Section 6.1 of the 2014 option agreement required Hedge Red to hold financial instruments that "provide Issuer [Hedge Red] with the ability to meet its obligations hereunder to Holder [SLS], net of any debt issued by Holder to Issuer."  Hedge Red never held any financial instruments for the purpose of satisfying this requirement.  Section 6.1 of the 2014 option agreement further provided that "[Hedge Red] will be wholly-owned by [MVP] and will conduct no business except that associated with this Agreement."

Section 1.1 of the 2014 option agreement provided that, no later than two business days after August 29, 2014, SLS would pay Hedge Red $609,000 "in exchange for the issuance of the Call by [Hedge Red]

---

[4] Section 2.3.2 of the 2014 option agreement used the term "face *amount* of bonds" even though section 2.3.1 used the term "face *value* of bonds."

[*13] to [SLS] pursuant to this Agreement." The 2014 option agreement stated that the $609,000 payment was "separate from [SLS's] previous payment of the transaction fee to [Hedge Red], which [Hedge Red] acknowledges."

On August 29, 2014, Hedge Red bought an interest-rate cap from the National Bank of Canada (NBC). The price of the NBC interest-rate cap was $609,000, which was its fair market value. The NBC interest-rate cap has a notional amount of $11,200,000. The NBC interest-rate cap has 96 quarterly observation dates that start on August 26, 2020, and continue through to May 26, 2044. If, on any quarterly observation date, the three-month Libor exceeds 8%, then NBC is liable to SLS as to that particular quarter for the product of the notional amount and the excess, a liability that accrues interest at the applicable OIS rate until the termination date of the NBC interest-rate cap (i.e., August 29, 2044). The NBC interest-rate cap is payable only on its termination date of August 29, 2044. However, Hedge Red could access the value of the NBC interest-rate cap before August 29, 2044, by selling it.

After Hedge Red bought the NBC interest-rate cap on August 29, 2014, Hedge Red's only assets (except for a few thousand dollars of cash) were (1) the NBC interest-rate cap and (2) the 2014 note.

For setting up the transactions that included the 2014 note, the 2014 option agreement, and the NBC interest-rate cap, SLS paid a $36,000 fee to MVP and Hedge Red. SLS also paid Akerman LLP $890,000 pursuant to an arrangement under which Akerman LLP acted as an escrow agent with respect to the transactions. When the transactions closed, Akerman LLP then transferred the following amounts out of the escrow: (1) $609,000 to Hedge Red, (2) $268,000 to Dermody, and (3) $5,000 to a "springing manager." The record does not show what happened to the remaining $8,000 of the $890,000 that was originally in the escrow.

Using the $609,000 it received from the escrow, Hedge Red paid the $609,000 to NBC for the NBC interest-rate cap.

Akerman LLP and Gopman's fees for performing legal services with respect to the transactions were billed separately from the escrow arrangement. The record does not reveal the amount of their legal fees.

On November 24, 2014, Rubinger sent Shannon Stevens the final version of his tax opinion letter. The letter concluded, among other things, that the 2014 note would be treated as indebtedness for federal

[*14] income tax purposes so that SLS would be able to deduct interest on the note as it accrued. The letter was addressed to Kirk Stevens as president of SLS.

Bill McDermott, a certified public accountant, began preparing SLS's tax return for the tax year 2014. McDermott had a copy of Rubinger's tax opinion letter. On or before August 21, 2015, McDermott suggested to Shannon Stevens that it was advisable for taxpayers to disclose "certain tax shelter" transactions to the IRS and asked her whether she thought such a disclosure was warranted with respect to the deductions for interest accruing on the 2014 note. On August 21, 2015, Shannon Stevens asked Gopman about McDermott's inquiry. Gopman in turn sought Rubinger's views. Rubinger explained to Gopman that he would advise against claiming the interest deductions at all. Rubinger asked Gopman not to reveal this advice to petitioners. Gopman refused. He explained to Rubinger: "We cannot keep the advice between you and me though as we have to advise them [i.e., petitioners] the right way." Gopman made petitioners aware that Rubinger advised against claiming the interest deductions.

By the time SLS filed its return for tax year 2014, petitioners knew that Rubinger had advised against claiming deductions for interest accruing on the 2014 note.

For tax year 2014, SLS timely filed its Form 1120S, U.S. Income Tax Return for an S Corporation. On line 13 the return claimed an interest deduction of $6,142,838. Before the Form 1120S was filed, MVP had reported to SLS on an "Annual Investment Report" that during 2014 the "Original Issue Discount Interest" on the 2014 note was $6,124,899. This is $17,939 less than the amount on line 13 of the Form 1120S.

For tax year 2014 petitioners timely filed their Form 1040, U.S. Individual Income Tax Return. This return reported the passthrough of income and deductions of SLS.

On January 1, 2016, the 2014 note matured without having been repaid. When it matured, the 2014 note had a balance of $125,363,397.

Between June 22 and July 7, 2016, SLS and Hedge Red entered into a second promissory note (2016 note). Under the 2016 note, SLS promised to pay Hedge Red the principal amount of $126,629,694, plus interest, on October 1, 2046. The 2016 note stated that its effective date was January 1, 2016, which was the maturity date of the 2014 note. The 2016 note provided that "[i]nterest shall accrue on this Note at the rate

[*15] of 1.5% per quarter compounded quarterly on the first day of each quarter on the basis of the actual number of days in a quarter . . . until the cancellation of this Note." The initial principal amount of the 2016 note was $1,266,297 greater than the balance on the 2014 note on the 2014 note's maturity date of January 1, 2016. The interest rate on the 2016 note of 1.5% per quarter was much lower than the interest rate on the 2014 note (of 4.5% per quarter). The 2016 note required no payments of principal or interest before the note's maturity date of October 1, 2046. However, the 2016 note allowed SLS to prepay principal and interest subject to a prepayment penalty. As with the 2014 note, the 2016 note contained the following provisions related to the 2014 option agreement and the call option created by that agreement: First, the 2016 note provided that Hedge Red had a security interest in the call option that secured SLS's debt to Hedge Red under the 2016 note; second, the 2016 note provided that SLS was liable on the 2016 note only to the extent of this security interest; and third, the 2016 note provided that Hedge Red had no recourse against any of SLS's assets other than through Hedge Red's security interest in the call option.

None of the parties in our case take the position that the 2016 note created a debt additional to the 2014 note (resulting in SLS's having two debts). Petitioners take the position that the 2016 note replaced the 2014 note. Respondent takes the position that both notes are fictitious.

After the execution of the 2016 note, Hedge Red's only assets (except for a few thousand dollars cash) were (1) the NBC interest rate cap and (2) the 2016 note.

Between September 28 and October 11, 2016, the parties to the 2014 option agreement executed a new option agreement that replaced the 2014 option agreement (2016 option agreement). The preamble to the 2016 option agreement stated that the agreement was intended to amend and restate the 2014 option agreement for the purpose of correcting "errors" that had been discovered in the 2014 option agreement. Section 1.2 of the 2016 option agreement stated that the 2014 option agreement "is superseded by" the 2016 option agreement. The preamble to the 2016 option agreement stated that the 2016 option agreement "is written and shall be treated as if it were the original agreement on Date.0 [defined as August 29, 2014]."

**[\*16]** Section 1.1 of the 2016 option agreement stated: "No later than two . . . Business Days following [August 29, 2014], [SLS] paid [Hedge Red] $609,000.00 and issued a Note of 29 August 2014 for $100,000,000 to [Hedge Red] . . . , in exchange for the issuance of Call by [Hedge Red] to [SLS]."[5] The "Call" was defined by the preamble to the 2016 option agreement as a "certain Bermuda Call Option" that had been previously "purchased" by SLS and "issued" by Hedge Red to SLS but that was "specified" in section 2 of the 2016 option agreement. Section 1.1 of the 2016 option agreement stated that the $609,000 payment "is separate from [SLS's] previous payment of the transaction fee to [Hedge Red], which [Hedge Red] acknowledges."

The preamble to the 2016 option agreement defined Date.0 as August 29, 2014. Section 2.1.2 of the 2016 option agreement defined Date.1 through Date.121 as the first date of each of the respective 121 full calendar quarters after August 29, 2014. Thus, Date.1 is October 1, 2014, and Date.121 is October 1, 2044.

Section 2.2 of the 2016 option agreement gave SLS the right to exercise the call option on any, but only one, of the dates in the set Date.6 to Date.121. The 2016 option agreement defined the date on which SLS exercised the call as the Exercise Date. Date.6, the first potential exercise date, is January 1, 2016. By the time the 2016 option agreement was executed (i.e., sometime between September 28 and October 11, 2016), several of the potential exercise dates had already passed. The potential exercise dates that had passed when the 2016 option agreement was executed were:

| |
|---|
| January 1, 2016 |
| April 1, 2016 |
| July 1, 2016 |
| October 1, 2016 (only if the 2016 option agreement was executed after October 1, 2016) |

This means there were either 112 or 113 exercise dates available when the 2016 option agreement was executed.

---

[5] Although section 1.1 of the 2016 option agreement stated that the 2014 note had been issued for $100 million, the actual principal amount of the 2014 note by its own terms was $99 million.

**[\*17]** Section 2.4 of the 2016 option agreement provided:

> If Holder [i.e., SLS] exercises at Date.$k$, for k = 6,7,8,…,121, then Holder will, as specified in (2.6), pay Issuer [i.e., Hedge Red]
>
> SPRICE.$k$ = \$99,918,000/(1.015)$^{121-k}$

Section 2.6 of the 2016 option agreement provided: "If Holder [i.e., SLS] exercises the Call on an Exercise Date Date.$k$, then Issuer [i.e., Hedge Red] shall at its sole discretion elect: a Settlement Date ('Date.Set'), on one of the 10 Business Days following Exercise Date; and either Physical Settlement specified in (2.6.1), or Cash Settlement specified in (2.6.2)." Section 2.6.1 and 2.6.2 of the agreement provided:

> *2.6.1 Physical Settlement* If Issuer [i.e., Hedge Red] elects Physical Settlement, then on Date.Set: Issuer shall deliver to Holder [i.e., SLS] the face amount of bonds specified in (2.3) of the type or types specified in (2.5) in exchange for Holder paying Issuer SPRICE.$k$ two years later on Date.($k$+8). Holder shall post collateral, free and clear of all liens and encumbrances, for the benefit of Issuer and maintain that collateral until the following are paid in full: (a.) SPRICE.$k$ specified in (2.4), and (b.) any principal and interest due on any Holder's debt to Issuer associated with Call purchase ("Holder Debt"). This collateral shall: (c.) consist of U.S. dollar funds and/or bonds specified in (2.5); and (d.) have face value equal to SPRICE.$k$, plus any Holder Debt that will be outstanding on Date.($k$+8); and
>
> *2.6.2 Cash Settlement* If Issuer elects Cash Settlement, then on Date.Set, Issuer shall pay to Holder in cash an amount equal to the face amount of bonds specified in (2.3) less the sum of SPRICE.$k$ and HOLDER DEBT, all discounted back from Date.($k$+8) to Exercise Date Date.$k$ by the Overnight Index Swap Rate for that period observed on Date.$k$. If this amount is a negative, then this payment is [to] be made by HOLDER to ISSUER. The Parties acknowledge and agree that Cash Settlement satisfies all obligations of Issuer and Holder associated with the Call and any such debt associated with Call. Under Cash Settlement, Holder shall have no obligation to make any separate payment of any Strike Price or Holder Debt, and shall have no obligation to post any collateral after Cash Settlement.

In the excerpt above, there is inconsistent capitalization of certain terms, i.e., "Holder," "Issuer," and "Holder Debt." We have reprinted the terms using their original inconsistent capitalization.

**[*18]** Section 2.3 of the 2016 option agreement defined the face amount of the bonds:

> The face amount of bonds to be delivered on an Exercise Date Date.$k$, in a Physical Settlement of Call, or used to compute a Cash Settlement of Call, is
>
> Bundle.$k$ =
>
> $11,200,000 [14.346394(1.015)$^{k-6}$ + MAX {0, $O.k$–8%} (1+$OIS.k$)$^{121-k}$].

The reference here to delivery "on an Exercise Date Date.$k$" is inconsistent with section 2.6.1 of the 2016 option agreement, which requires delivery of the bonds to occur on the Settlement Date, defined as one of the 10 business days after the Exercise Date. Because section 2.6.1 directly requires delivery to occur on the Settlement Date, we conclude that delivery must occur on the Settlement Date.

$O.k$ is defined in the 2016 option agreement as the three-month Libor observed on Date.$k$.

$OIS.k$ is defined in the 2016 option agreement as the "Overnight Index Swap rate from Date.$k$ to Date.121 observed on Date.$k$." As explained by Steve Pomerantz, an expert witness called by petitioners, "OIS.$k$ represents a present value factor from each Date.$k$ through the end of the call."[6]

Section 2.5 of the 2016 option agreement provided that "in Physical Settlement on an Exercise Date Date.$k$, the bonds delivered shall consist of debt maturing on or before Date.($k$+8)." The same provision also required the bonds to meet certain requirements regarding credit quality and issuer.

Section 6.1 of the 2016 option agreement required Hedge Red to hold financial instruments that "provide [Hedge Red] with the ability to meet its obligations hereunder to Holder [i.e., SLS], net of any debt issued by Holder to Issuer." Hedge Red never held any financial instruments for the purpose of satisfying this requirement. Section 6.1 of the 2016 option agreement also provided that "[Hedge Red] is and will be a wholly-owned by [MVP] and will conduct no business except that associated with" the 2016 option agreement.

---

[6] Pomerantz holds a Ph.D. in mathematics from the University of California at Berkeley.

[*19] Although we have now recited the major provisions of the 2016 option agreement, further analysis is necessary to understand their operation. As explained before, the formula for the face value of the bonds in the 2016 option agreement is

Bundle.$k$ =

$11,200,000 [14.346394(1.015)$^{k-6}$ + MAX {0, $O.k$–8%} (1+$OIS.k$)$^{121-k}$].

The Bundle.$k$ formula in the 2016 option agreement can be broken into two components through the distributive property of multiplication. The first component is

(11,200,000)(14.346394)(1.015$^{k-6}$).

The second component is

11,200,000 [MAX {0, $O.k$–8%} (1+$OIS.k$)$^{121-k}$].

As to the second component, the formula for Bundle.$k$ contains an error that we will discuss later.

As part of his expert testimony, Pomerantz created a mathematical model of the relationship among (1) the first component of Bundle.$k$, (2) SPRICE.$k$, and (3) the balance on the 2016 note. For the scenario in which Hedge Red elects physical settlement in response to SLS's call, Pomerantz demonstrated through the mathematical model that for every value of $k$ the balance on the 2016 note is equal to (a) the first component of Bundle.$k$ minus (b) SPRICE.$k$. His model requires some explanation.

Pomerantz defined the first component of Bundle.$k$ as (11,200,000)(14.346394)(1.015$^{k-6}$). The first component of Bundle.$k$ is predetermined in the sense that it depends entirely on the exercise date and not on the market interest rate. It is significant that the first component of Bundle.$k$ expresses the "face value" of the bonds. The "face value" of a bond is its value at maturity. Hedge Red is permitted by the 2016 option agreement to select bonds with a maturity date of up to two years after Date.$k$. Hedge Red will naturally choose the maximum maturity date of two years after Date.$k$ because the present value of a bond with a distant maturity date is less than the present value of a bond with an imminent maturity date and the same value at maturity. *See* Morey W. McDaniel, *Bondholders and Stockholders*, 13 J. Corp. L. 205, 228 (1988) ("If the maturity date of bonds is extended into the future, the present value of the future payment decreases."). Because

**[*20]** the bonds to be delivered will mature on Date.$k$ plus two years, their market value at delivery would be the discounted present value of $(11,200,000)(14.346394)(1.015^{k-6})$, using a future value date of Date.$k$ plus two years and a date of valuation of the date of delivery. The date of delivery is one to ten business days after Date.$k$. For the purpose of this discounted-present-value calculation, the discount rate that would be used would be a market rate of interest prevailing on the delivery date. This rate would be unknowable until the delivery date. Instead of using the market value of the bonds on the delivery date, which would have required such a discounted-present-value calculation, Pomerantz's model evaluated the first component of Bundle.$k$ at Date.$k$ plus two years. This is the same date used by the model to express SPRICE.$k$ and the balance of the 2016 note at Date.$k$ plus two years.

Pomerantz defined SPRICE.$k$ as $99,918,000/(1.015^{121-k})$, an expression taken directly from section 2.4 of the 2016 option agreement. The strike price, $99,918,000/(1.015^{121-k})$, was required by the 2016 option agreement to be paid two years after Date.$k$ *i*n the instance of physical-settlement election.

Pomerantz defined the balance of the 2016 note as $(126,629,694)(1.015^{k+2})$. This expression represented the balance on the 2016 note on Date.($k$+8*)* if the Exercise Date is Date.$k$. Pomerantz calculated the balance on the 2016 note not on the Exercise Date, Date.$k$, but on Date.($k$+8), which is two years after the Exercise Date. Calculating the balance on the 2016 note on Date.($k$+8) is appropriate for two reasons. First, for any Exercise Date Date.$k$, SLS was obligated to make payment of the strike price, SPRICE.$k$, on Date.($k$+8*)*. Second, for any Exercise Date Date.$k$, the value of the bonds that must be delivered by Hedge Red is expressed in the formula for Bundle.$k$, as their face value, which is their value at maturity, which is their value on Date.($k$+8).

Having explained that it is appropriate for Pomerantz to calculate the balance of the 2016 note on Date.($k$+8), we now explain why the expression used by Pomerantz represents the balance on the 2016 note on Date.($k$+8). To understand why the expression $(126,629,694)(1.015^{k+2})$ represents the balance on the 2016 note on Date.($k$+8), it is helpful to consider some specific calculations of the balance on the 2016 note:

**[\*21]**

| Date balance calculated | Balance of 2016 note on that date |
|---|---|
| 1/1/16 | $(126{,}629{,}694)(1.015^0)$ |
| 4/1/16 | $(126{,}629{,}694)(1.015^1)$ |
| 7/1/16 | $(126{,}629{,}694)(1.015^2)$ |
| 10/1/16 | $(126{,}629{,}694)(1.015^3)$ |
| 1/1/17 | $(126{,}629{,}694)(1.015^4)$ |
| 4/1/17 | $(126{,}629{,}694)(1.015^5)$ |
| 7/1/17 | $(126{,}629{,}694)(1.015^6)$ |
| 10/1/17 | $(126{,}629{,}694)(1.015^7)$ |
| 1/1/18 | $(126{,}629{,}694)(1.015^8)$ |

If the Exercise Date is January 1, 2016, then by definition Date.$k$ is Date.6 and $k$=6. As shown in the table above, on Date.($k$+8) (i.e., on January 1, 2018) the balance of the 2016 note is $(126{,}629{,}694)(1.015^8)$, which is $(126{,}629{,}694)(1.015^{k+2})$. To generalize for any Exercise Date Date.$k$, the balance on the 2016 note two years later on Date.($k$+8) is $(126{,}629{,}694)(1.015^{k+2})$.

Pomerantz used his mathematical model to prove that the loan balance,

$(126{,}629{,}694)(1.015^{k+2})$,

was equal to

$(11{,}200{,}000)(14.346394)(1.015^{k-6}) - 99{,}918{,}000/(1.015^{k-121})$,

which is the face value of the bonds to be delivered (taking into account only the first component of Bundle.$k$) minus the strike price.

Pomerantz's proof was as follows:

$(11{,}200{,}000)(14.346394)(1.015^{k-6}) - 99{,}918{,}000/(1.015^{121-k})$

$= (11{,}200{,}000)(14.346394)(1.015^{k-6}) - (99{,}918{,}000)(1.015^{k-121})$

$= (160{,}679{,}613)(1.015^{k-6}) - (99{,}918{,}000)(1.015^{k-121})(1.015/1.015)^{121-6}$

$= (160{,}679{,}613)(1.015^{k-6}) - (99{,}918{,}000)(1/1.015^{121-6})(1.015^{k-6})$

$= (160{,}679{,}613)(1.015^{k-6}) - (18{,}032{,}206)(1.015^{k-6})$

**[*22]** $= (142{,}647{,}407)(1.015^{k\text{-}6})$

$= (126{,}629{,}694)(1.015^{8})(1.015^{k\text{-}6})$

$= (126{,}629{,}694)(1.015^{k+2}).$

All amounts in Pomerantz's proof are taken directly from his expert report. We have not attempted to explain rounding discrepancies or other minor discrepancies. His mathematics are essentially correct.[7]

Pomerantz gave the following example to illustrate the equality he proved. Suppose SLS exercises the option provided by the 2016 option agreement on January 1, 2016. By definition, Date.$k$ would be January 1, 2016.[8] And $k$ would be 6. The example assumes that Hedge Red elects physical settlement. Thus, Hedge Red would be required to deliver bonds to SLS soon after exercise of the option.[9] Pomerantz computed the first component of Bundle.$k$ to be \$160,679,613.[10] This amount represented the face amount of the bonds to be delivered, i.e., their value at maturity.[11] Maturity would be January 1, 2018, two years after the exercise date.[12] Pomerantz further calculated that SPRICE.$k$ that corresponds to the exercise date of Date.6 would be

---

[7] An alternative way of proving the same thing is:

$(11{,}200{,}000)(14.346394)(1.015^{k\text{-}6}) - (99{,}918{,}000)(1.015^{k\text{-}121})$

$= 1.015^{k+2}[(11{,}200{,}000)(14.346394)(1.015^{k\text{-}6})/1.015^{k+2}-(99{,}918{,}000)(1.015^{k\text{-}121})/1.015^{k+2}]$

$= 1.015^{k+2}[(11{,}200{,}000)(14.346394)(1.015^{\text{-}8})-(99{,}918{,}000)(1.015^{\text{-}123})]$

$= 1.015^{k+2}[(160{,}679{,}612.8)(1.015^{\text{-}8})-(99{,}918{,}000)(1.015^{\text{-}123})]$

$= 1.015^{k+2}[142{,}637{,}079.651-16{,}007{,}390.3564]$

$= 1.015^{k+2}[126{,}629{,}689.295].$

[8] Pomerantz testified: "For illustrative purposes, I assume the option is exercised on December 31, 2015 or Date.6, i.e. for the value k=6 through the formulas above." Pomerantz's use of December 31, 2015, instead of January 1, 2016, appears to be a convention that does not affect his calculations.

[9] Specifically, the bonds would need to be delivered on the settlement date, which must be one to ten business days after the exercise date.

[10] Pomerantz testified: "In this event, the first component of Bundle.k = \$160,679,613."

[11] The bonds would not have a current market value of \$160,679,613 on delivery because they would not have yet matured.

[12] Pomerantz testified: "[B]onds with a face value of \$160,679,613 will be delivered from Hedge Red to SLS. These bonds must mature prior to Date.14, or in effect have a maturity of less than 2 years and satisfy certain credit and issuer requirements."

**[\*23]** $18,032,207.[13]   As set forth in the terms of the 2016 note, SPRICE.$k$ for an Exercise Date of Date.6 would be paid on Date.14. Pomerantz further calculated that by Date.14 (January 1, 2018), the accrued interest and principal on the 2016 note would have been compounded over eight quarters and would be $142,467,412.[14]   This loan-balance amount, Pomerantz explained, is "identical" to $160,679,613 minus $18,032,207, or $142,647,406.   Indeed, the two amounts differ by a trivial $6.

A second example of physical settlement given by Pomerantz was exercise of the option on January 1, 2018 ($k$=14).[15]   Pomerantz's calculations with respect to this example are set forth in the table below, which compares these calculations to Pomerantz's prior example of January 1, 2016 ($k$=6):

| $k$ | (1)<br>First component of Bundle.$k$ | (2)<br>SPRICE.$k$ | (3)<br>Difference between (1) and (2) | (4)<br>Accrued interest and principal on 2016 note |
|---|---|---|---|---|
| 6 | 160,679,613 | 18,032,207 | 142,647,406 | 142,647,412 |
| 14 | 181,004,393 | 20,313,147 | 160,691,246 | 160,691,252 |

Dan Levy, an expert witness called by respondent,[16] agreed with Pomerantz's view that for every value $k$, the (1) accrued interest and principal on the 2016 note would equal (2) the first component of Bundle.$k$ minus SPRICE.$k$.[17]   Levy's opinion in this regard did not distinguish between physical settlement and cash settlement.   We have not yet discussed cash settlement.   As to physical settlement, we state our conclusion as follows: We agree with Pomerantz's and Levy's view that for every value $k$ (1) the accrued interest and principal on the 2016

---

[13] Pomerantz testified: "The Strike price, SPRICE.k as of this date [Date.14] will be $18,032,207."

[14] Pomerantz testified: "[T]he promissory note of $126,629,694 accrues interest at a rate of 1.5% per quarter and by Date.14 which is 8 quarters after issuance, the amount owed is then $142,647,412."

[15] Pomerantz explained: "[I]f exercise occurs for k=14, the Net proceeds [defined by him as the first component of Bundle.$k$ minus SPRICE.$k$] will be $181,004,393 less $20,313,147 or $160,691,246 which equals the December 31, 2017 loan balance of $142,647,412 with 2 years of interest."

[16] Levy holds a Ph.D. in economics from the University of Chicago.

[17] Levy referred to the first component of Bundle.$k$ as a "predetermined no-risk payment," or "PNP."   He testified that the "PNP, including the strike price, is the mirror image of the Note."

**[\*24]** note (i.e., its balance) would equal (2) the first component of Bundle.$k$ minus SPRICE.$k$.

We now analyze the provisions of the 2016 option agreement involving cash settlement. Under section 2.6.2 of the 2016 option agreement, the cash amount to be paid by Hedge Red is equal to (1) the face amount of the bonds specified in section 2.3 of the 2016 option agreement minus (2) "the sum of SPRICE.$k$ and HOLDER DEBT," with all these amounts "discounted back from Date.($k$+8) to Exercise Date Date.$k$ by the overnight Index Swap Rate for the period observed on Date.$k$+8." Significantly, a provision in section 2.6.2 of the 2016 option agreement is "Cash Settlement satisfies all obligations of Issuer [i.e., Hedge Red] and Holder [i.e., SLS] associated with the Call and any such debt associated with Call." Also significant is a provision in section 2.6.2 of the 2016 option agreement that "[u]nder cash settlement, Holder shall have no obligation to make any separate payment of any strike price or Holder Debt."

In analyzing the cash-settlement provisions, we initially assume, as we did with physical settlement, that the only component of Bundle.$k$ is the first component. This same assumption was made by Pomerantz as he attempted to compare the cash payment required under the 2016 option agreement (in the event of cash settlement) with the balance on the 2016 note. Our assumption that there is no second component of Bundle.$k$ is a provisional assumption. Later on in this Opinion we analyze the second component of Bundle.$k$.

Pomerantz opined that if the Exercise Date were January 1, 2016, and if SLS elected cash settlement, then the cash payment due from Hedge Red would be equal to (1) the first component of Bundle.6 minus (2) SPRICE.6. Pomerantz further opined that the amount of the cash payment would be equal to the balance on the 2016 note. Pomerantz's explanation for these opinions was as follows:

> If settlement is done on a cash basis, then Hedge Red will pay SLS an amount equal to the face amount of bonds specified by Bundle.k less SPRICE.k. For k=6, this amounts to $160,679,613 less $18,032,207 or $142,647,406.

> Recall that the promissory note of $126,629,694 accrues interest at a rate of 1.5% per quarter and by Date.14 which is 8 quarters after issuance, the amount owed is then

**[\*25]** $142,647,412, which is identical to the net proceeds of the Bermuda option.

Although Pomerantz did not state so specifically, it is plain that Pomerantz thought that the cash payment due from Hedge Red would equal the balance on the 2016 note for any exercise date, not just for January 1, 2016.

Petitioners in their First Supplemental Brief Regarding Cash Settlement Election with Exercise Date of January 1, 2016 (supplemental brief), concede that Pomerantz's calculations for a January 1, 2016, exercise date are erroneous in two regards. First, as to Pomerantz's view that the cash-settlement payment would be $142,647,406, petitioners clarify that the amount of the payment would be this amount but "discounted over two years (i.e. from Date.14 to within 10 business days of Date.6) using the OIS rate." Petitioners explain that the amount of the discount (and therefore the magnitude of Pomerantz's error) would be small: "With an OIS rate around 0.3%, the payout at settlement would be only slightly less than $142,647,406." Second, as to Pomerantz's view that the balance on the 2016 note was $142,647,412, petitioners explain that the "balance on the promissory note" should be calculated as of the settlement date. That balance, petitioners contend, is only "$126,629,694 plus whatever interest accrues over the next few days until settlement." The second error identified by petitioners in their supplemental brief is a timing error. For an exercise date of January 1, 2016, Pomerantz should not have calculated the balance on the 2016 note on January 1, 2018, but rather on the settlement date (which would be in the range January 2 to 11, 2016). Stated generally, Pomerantz's error was to calculate the balance of the 2016 note on Date.$k$+8 instead of Date.Set. Pomerantz's error resulted in his overstating the balance of the 2016 note for any exercise date.

Another issue with Pomerantz's calculations as to cash settlement relates to the cash payment due from Hedge Red. Under the 2016 option agreement, this amount is equal to

Face amount of the bond – (SPRICE.$k$+"HOLDER DEBT")

setting aside discounting for the time value of money. Pomerantz assumed that "HOLDER DEBT" does not include the balance owed by SLS to Hedge Red under the 2016 note. And petitioners contend that this assumption reflects the best interpretation of the 2016 option

[*26] agreement. Respondent disagrees, contending that the term "HOLDER DEBT" does include the balance on the 2016 note.

We agree with respondent that "HOLDER DEBT" includes the balance on the 2016 note. "HOLDER DEBT" is defined by the 2016 option agreement as "any Holder's debt to Issuer [i.e., any SLS debt to Hedge Red] associated with Call purchase." The 2016 note was a replacement for the 2014 note, which was used to purchase the 2014 option agreement, which itself was replaced by the 2016 option agreement. Thus, the 2016 note was SLS's debt to Hedge Red incurred to purchase the call option embedded in the 2016 option agreement. Furthermore, the 2016 option agreement is the only security for the 2016 note and is the only asset against which the 2016 note could be collected. The 2016 option agreement is explicitly referenced in the 2016 note's default provisions governing what would happen if SLS defaulted on the 2016 note. Therefore, we conclude that the 2016 note is a "debt associated with the . . . purchase" of the 2016 option agreement.

Once one concludes that "HOLDER DEBT" includes the balance on the 2016 note, there arises the issue of the date on which to calculate the balance on the 2016 note. In respondent's view, it is Date.$(k+8)$, not Date.$k$, that should be used to determine the balance on the 2016 note for the purpose of ascertaining the amount of "HOLDER DEBT." We agree. Paragraph 2.6.1 of the 2016 option agreement specifies that "HOLDER DEBT" should be calculated as the amount "outstanding on Date.$(k+8)$." The amount of "HOLDER DEBT" used to determine the amount of collateral required to be posted if the option is physically settled under paragraph 2.6.1 of the 2016 option agreement should match the amount of "HOLDER DEBT" used to determine the cash-settlement amount under paragraph 2.6.2. Furthermore, paragraph 2.6.2 of the 2016 option agreement confirms that "HOLDER DEBT" is calculated at Date.$(k+8)$ as it requires that the "HOLDER DEBT" be discounted back from Date.$(k+8)$ when determining the amount of the cash-settlement payment.

Taking into account our conclusion that "HOLDER DEBT" includes the balance of the 2016 note at Date.$(k+8)$, it is our opinion that if SLS had called the option on January 1, 2016, and if Hedge Red had elected cash settlement, the cash payment required to be paid by Hedge Red to SLS would be equal to $160,679,612.80 − $18,032,206.57 − $142,647,411.53 = −$5.30, discounted back two years from January 1, 2018, to January 1, 2016. The cash payment amount is essentially zero. This observation holds not just for $k=6$, but for any exercise date. Thus,

**[*27]** we conclude that for any exercise date, the amount required to be paid by Hedge Red to SLS under the 2016 option agreement in the event of a cash-settlement election is essentially zero. Again, this conclusion takes into account the first component of Bundle.$k$ but not the second.

A cash-settlement election would have the effect of satisfying the 2016 note. This is so because section 2.6.2 of the 2016 option agreement provides that cash settlement satisfies any debt associated with the call. The 2016 note is such a debt. Also, section 2.6.2 of the 2016 option agreement provides that after cash settlement SLS has no obligation to pay "HOLDER DEBT." "HOLDER DEBT" includes the 2016 note.

In summary, then, we believe that the effects of a cash-settlement election are that (1) SLS would be required to pay zero dollars as to the first component of Bundle.$k$ and (2) the 2016 note would be satisfied.[18]

We now analyze the second component of Bundle.$k$. The parties in our case agree that the second component of Bundle.$k$ is intended to model an interest-rate cap with a notional amount of \$11,200,000 and a strike rate of 8%. The expression MAX $\{0, O.k-8\%\}$ evaluates the three-month Libor on the observation date $k$ compared to the 8% strike rate. If $O.k$ is less than or equal to 8%, then the value of MAX $\{0, O.k-8\%\}$ is equal to zero. If $O.k$ is greater than 8%, then the value of MAX $\{0, O.k-8\%\}$ is equal to the difference between $O.k$ and 8%, which is then multiplied by the notional amount of \$11,200,000. The expression $(1+OIS.k)^{121-k}$ is interest that accrues on this value at the $OIS$ rate from the observation date until the expiration of the option.

As written in section 2.3 of the 2016 option agreement, the second component of Bundle.$k$ contains an error. The expression accounts for only one observation date. Instead of incorporating one observation date (i.e., expressing MAX $\{0, O.k-8\%\}(1+OIS.k)^{121-k}$ with Date.$k$ as the sole observation date), the expression should have been a sum for all quarterly observations through the date of exercise. For example, if the call option were exercised on Date.34, then the expression should be

$$\$11,200,000[\text{MAX } \{0, O.1-8\%\} (1+OIS.1)^{121-1}+\text{MAX } \{0, O.2-8\%\} (1-OIS.2)^{121-2} + \ldots +\text{MAX } \{0, O.34-8\%\} (1-OIS.34)^{121-34}].$$

---

[18] Because we believe "HOLDER DEBT" includes the 2016 note, our method of calculating the cash payment is different from Pomerantz's method. Our calculation is unaffected by Pomerantz's errors identified by petitioners in their supplemental brief.

**[\*28]** And for all exercise dates, the expression should be rewritten as

$$\$11,200,000\sum_{k=1}^{x} MAX\{0, O.k - 8\%\}(1 + OIS.k)^{121-k}$$

where x is the quarter in which the option is exercised and x cannot be less than 6 or more than 121. None of the parties in our case dispute that the 2016 option agreement should be treated as operating the way it should be rewritten as described above.

For tax year 2015 SLS timely filed its Form 1120S. On line 13 the return claimed an interest deduction of $20,238,527. Included with the Form 1120S was a Form 8275, Disclosure Statement. The Form 8275 stated that $20,238,498 of the interest deduction claimed on line 13 was interest on the 2014 note. Before the Form 1120S was filed, MVP had reported to SLS on an "Annual Investment Report" that during 2015 the "Original Issue Discount Interest" on the 2014 note was $20,238,498. This is $29 less than the amount on line 13 of the Form 1120S.

For tax year 2015 petitioners timely filed their Form 1040. This return reported the passthrough of income and deductions of SLS.

For tax year 2016 SLS timely filed its Form 1120S. On line 13 the return claimed an interest deduction of $7,808,184. Included with the Form 1120S was a Form 8275. The Form 8275 stated that $7,808,135 of the interest deduction on line 13 was interest on the 2016 note. Before the Form 1120S was filed, MVP had reported to SLS on an "Annual Investment Report" that during 2016 the "Original Issue Discount Interest" on the 2016 note was $7,808,135. This is $49 less than the amount on line 13 of the Form 1120S.

For tax year 2016 petitioners timely filed their Form 1040. This return reported the passthrough of income and deductions of SLS.

In January 2018 petitioners filed Form 1040X, Amended U.S. Individual Income Tax Return, for tax year 2013 claiming a deduction for a net operating loss carried back from tax year 2015. The net operating loss resulted from deductions for interest accruing on the 2014 and/or 2016 notes and which had been claimed on the Forms 1120S for 2014, 2015, and/or 2016. The Form 1040X claimed a $556,444 refund for 2013.

Joseph Battaglino was the revenue agent assigned to examine petitioners' returns. He made respondent's initial determinations to assert (1) the section 6676(a) penalty for 2013 and (2) section 6662(a)

**[\*29]** penalties under section 6662(b)(1) for tax years 2014, 2015, and 2016. *See infra* Part V.B.1.

On May 17, 2018, Battaglino sent a Letter 1153 to petitioners. Petitioners and respondent agree that the Letter 1153 should be interpreted to assert section 6662(a) penalties under section 6662(b)(1) for tax years 2014, 2015, and 2016. We assume this interpretation to be correct because we do not resolve issues undisputed by the parties.

On October 19, 2018, Stephen Biggerstaff personally approved, by signing a penalty-approval form, Battaglino's initial determination to assert the section 6676 penalty for tax year 2013. The penalty approval form named Battaglino as the "[e]xaminer." Biggerstaff was Battaglino's immediate supervisor on that day.

On the same day, October 19, 2018, Biggerstaff personally approved, by signing another penalty-approval form, Battaglino's initial determination to assert section 6662(a) penalties under section 6662(b)(1) for tax years 2014, 2015, and 2016. The penalty-approval form named Battaglino as the "[e]xaminer."

On November 22, 2019, respondent mailed petitioners the two Notices of Deficiency.

The first Notice of Deficiency was for tax years 2014, 2015, and 2016.

As to tax year 2014, the first Notice of Deficiency disallowed the $6,142,838 of interest deductions claimed on SLS's Form 1120S. As a result of this adjustment, the Notice of Deficiency determined a deficiency of $1,466,197 for tax year 2014. The Notice of Deficiency determined that the underpayment for the year was attributable to a transaction lacking economic substance under section 6662(b)(6). The Notice of Deficiency further determined that the underpayment was attributable to an undisclosed transaction lacking economic substance under section 6662(i)(2), and that therefore petitioners were liable for a 40% penalty under section 6662(a) and (i)(1) of $586,478.80. We assume without deciding that the Notice of Deficiency determined that the underpayment for the year was attributable to negligence or disregard of rules or regulations under section 6662(b)(1), a substantial

**[\*30]** understatement of income tax under section 6662(b)(2), or a substantial valuation misstatement under section 6662(b)(3).[19]

As to tax year 2015, the first Notice of Deficiency disallowed the $20,238,527 of interest deductions claimed on SLS's Form 1120S. As a result of this adjustment, the Notice of Deficiency determined a deficiency of $3,322,459 for tax year 2015. The Notice of Deficiency determined that the underpayment for the year was attributable to negligence or disregard of rules or regulations under section 6662(b)(1), a substantial understatement of income tax under section 6662(b)(2), or a substantial valuation misstatement under section 6662(b)(3). As a result, the Notice of Deficiency determined that petitioners were liable for a 20% section 6662(a) penalty of $664,491.80 for tax year 2015.

As to tax year 2016, the first Notice of Deficiency disallowed $7,808,135 of deductions claimed on SLS's Form 1120S for interest accruing on the 2016 note. In addition, the Notice of Deficiency made an $89,599 unspecified upward adjustment to petitioners' reported income, for a total adjustment of $7,897,734 to petitioners' reported income. As a result of this total adjustment, the Notice of Deficiency determined a deficiency of $132,493 for tax year 2016. The Notice of Deficiency determined that the underpayment for the year was attributable to negligence or disregard of rules or regulations under section 6662(b)(1), a substantial understatement of income tax under section 6662(b)(2), or a substantial valuation misstatement under section 6662(b)(3). As a result, the Notice of Deficiency determined that petitioners were liable for a 20% section 6662(a) penalty of $26,498.60 for tax year 2016.

---

[19] We need not resolve whether the first Notice of Deficiency actually determined that as to tax year 2014 petitioners were liable under section 6662(b)(1), (2), or (3):

- As to section 6662(b)(1), the parties agree that this theory of liability was stated in the first Notice of Deficiency. Even if it was not stated in the first Notice of Deficiency, we would have jurisdiction to address the theory because it was later asserted in the Answer. *See* § 6214(a).
- As to section 6662(b)(2), it does not matter whether this theory of liability was stated in the first Notice of Deficiency because respondent would later concede this theory in his Motion for Partial Summary Judgment.
- As to section 6662(b)(3), it does not matter whether this theory of liability was stated in the first Notice of Deficiency because respondent would later waive this theory in his Opening Brief.

**[\*31]** The second Notice of Deficiency was for tax year 2013. The Notice of Deficiency determined that petitioners were not allowed the deduction for the net operating loss carryback claimed on Form 1040X for tax year 2013. The Notice of Deficiency consequently determined that petitioners were not entitled to the $556,444 refund they had claimed on their Form 1040X. The Notice of Deficiency also determined that petitioners were liable for the 20% penalty under section 6676(a) for an excessive claim for refund. The amount of the penalty was $111,288.80.

On February 12, 2020, the Petition was filed.

On June 18, 2020, respondent's Answer was filed. The Answer asserted that, as an alternative to the penalty under section 6662(b)(6) for a transaction lacking economic substance, the underpayment for tax year 2014 was attributable to negligence or disregard of rules or regulations under section 6662(b)(1) or a substantial understatement of income tax under section 6662(b)(2). The Answer asserted that, as an alternative to the penalties under section 6662(b)(1), (2), and (3) for tax years 2015 and 2016, the underpayments for those years was attributable to a transaction lacking economic substance under section 6662(b)(6). The Answer stated that respondent declined to seek the increased penalty rate set forth in section 6662(i)(1) for tax years 2015 and 2016 because the "noneconomic substance transaction was disclosed on SLS International's 2015 and 2016 tax returns."

In respondent's Motion for Partial Summary Judgment, filed February 13, 2023, respondent conceded that petitioners are not liable for section 6662(a) penalties under section 6662(b)(2) for tax years 2014, 2015, and 2016. In the Motion, respondent also conceded that petitioners are not liable for section 6662(a) penalties under section 6662(b)(6) for tax years 2015 and 2016.

Respondent's Pretrial Memorandum, filed April 21, 2023, conceded that petitioners are not liable for a 20% penalty under section 6662(a) and (b)(6) for tax year 2014. The Memorandum also conceded that petitioners are not liable for a 40% penalty under section 6662(a) and (i)(1) for tax year 2014.

Respondent's Opening Brief, filed September 19, 2023, contends that petitioners are liable for section 6662(a) penalties under section 6662(b)(1) for 2014, 2015, and 2016. Respondent does not argue that petitioners are liable for section 6662(a) penalties under section

[*32] 6662(b)(3). We therefore consider respondent to have waived any argument that section 6662(a) penalties should be imposed under section 6662(b)(3) for tax years 2014, 2015, 2016.

Because the procedural history of respondent's positions on penalty liability is lengthy, we summarize these positions for each tax year.

For tax year 2013 respondent's determination that petitioners are liable for the section 6676(a) penalty was stated in the second Notice of Deficiency. This position has been neither enlarged nor narrowed in subsequent court papers.

For tax year 2014 the following table summarizes what positions respondent has taken regarding the theory of penalty liability:

| Theory of penalty liability | Notice of Deficiency | Answer | Motion for Partial Summary Judgment | Pretrial Memorandum | Brief |
|---|---|---|---|---|---|
| § 6662(b)(1) | Assumed | Asserted | | | |
| § 6662(b)(2) | Assumed | Asserted | Conceded | | |
| § 6662(b)(3) | Assumed | | | | Waived |
| § 6662(b)(6) | Asserted | | | Conceded | |
| § 6662(i)(1) | Asserted | | | Conceded | |

For tax years 2015 and 2016, the following table summarizes what positions respondent has taken regarding the theory of penalty liability:

| Theory of penalty liability | Notice of Deficiency | Answer | Motion for Partial Summary Judgment | Brief |
|---|---|---|---|---|
| § 6662(b)(1) | Asserted | | | |
| § 6662(b)(2) | Asserted | | Conceded | |
| § 6662(b)(3) | Asserted | | | Waived |
| § 6662(b)(6) | | Asserted | Conceded | |

Taking into account the concessions and waivers, the only penalties remaining at issue are (1) the section 6676(a) penalty for tax year 2013 and (2) section 6662(a) penalties under section 6662(b)(1) for tax years 2014, 2015, and 2016.

**[*33]** The parties have stipulated that the first Notice of Deficiency erred in making the $89,599 unspecified adjustment to increase petitioners' reported income for tax year 2016.

OPINION

I.     *Petitioners bear the burden of proof (except that respondent has the burden of production as to whether the underpayments are due to negligence and whether the penalties were approved in writing by the appropriate supervisor).*

The usual rule in Tax Court litigation is that the taxpayer bears the burden of persuasion and the burden of production. *See* Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Estate of Gilford v. Commissioner*, 88 T.C. 38, 51 (1987). Petitioners are not disputing that they bear the burdens of persuasion and production, except that they contend that respondent has the burden of production as to whether the penalties were approved in writing by the appropriate supervisor. Our findings of fact are made with petitioners bearing the burden of persuasion. As discussed *infra* Part V.A, respondent has the burden of production as to whether the underpayments for 2014, 2015, and 2016 are attributable to negligence. As discussed *infra* Part V.B, respondent has the burden of production as to whether the penalties were approved in writing by the appropriate supervisor.

Our findings of fact are made without giving respondent any relief sought in his April 28, 2023, Motion in Limine to Sanction Petitioners for Failure to Produce Responsive Documents. In that pretrial Motion respondent claimed that there had been a "lack of cooperation with discovery requests and failure to preserve and produce evidence in anticipation of litigation" on the part of petitioners. The relief sought by the Motion was for the Court to "impose appropriate sanctions and draw negative inferences on all matters." On May 16, 2023, we issued an Order reserving our ruling on the Motion. Even without drawing inferences against petitioners or imposing any other sanctions, we sustain respondent's determinations reflected in the Notices of Deficiency (except for the $89,599 unspecified adjustment to increase petitioners' reported income for 2016, an adjustment that the parties have stipulated is in error and the merits of which do not depend on any inferences or sanctions). Thus, it would not make a difference to our decision if we were to grant respondent's Motion. We will deny that Motion as moot.

**[\*34]** II.    *The issue in this case is whether the 2014 and 2016 notes constitute true indebtedness.*

Section 163 provides that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." SLS, an S corporation, claimed deductions for interest allegedly accruing on the 2014 and 2016 notes. These claimed amounts were $6,142,838 for tax year 2014, $20,238,527 for tax year 2015, and $7,808,135 for tax year 2016. The amounts were passed through as deductions to petitioners, who were the owners of SLS, for each respective tax year. What follows is an explanation of the claimed amounts of interest deductions for all tax years at issue:

- *Tax year 2014.*  On its 2014 return SLS claimed $6,142,838 as interest-expense deductions. The return did not specify the specific debt or debts to which the interest expense corresponded. Respondent disallowed the entire claimed amount—$6,142,838—in the first Notice of Deficiency. Page 11 of petitioners' Opening Brief suggests that the entire claimed amount—$6,142,838—relates to the interest expense on the 2014 note. Specifically, on that page petitioners take the position that if the "Bermuda Call Option Agreement . . . has economic substance," then "[p]etitioners were entitled to interest deductions that they claimed in 2014-2016." However, other portions of petitioners' Opening Brief might be read to suggest that $17,939 of the $6,142,838 claimed as an interest-expense deduction is attributable to interest on debt other than the 2014 note. Their Opening Brief explains that "the Annual Investment Report from MVP Financial for 2014 reports OID interest of $6,124,899." Their Opening Brief then explains that the larger $6,142,838 amount is "comprised *almost* entirely of the interest associated with the hedge transaction." (Emphasis added.) To the extent these portions of petitioners' Opening Brief can be interpreted as implicitly suggesting that the $17,939 difference between the $6,142,838 claimed amount and the $6,124,899 amount shown on MVP's annual investment report is interest on some debt other than the 2014 note, petitioners have supplied no argument, and adduced no evidence, that the $17,939 amount is deductible. We thus do not consider the argument.

- *Tax year 2015.*  On its 2015 return, SLS claimed $20,238,527 as interest-expense deductions. The Form 8275 included with

**[*35]**   the return stated that only $20,238,498 of this amount was interest on the 2014 note. Respondent disallowed the entire claimed amount—$20,238,527—in the first Notice of Deficiency. Page 11 of petitioners' Opening Brief suggests that the entire claimed amount—$20,238,527—relates to the interest expense on the 2014 note. Specifically, on that page petitioners take the position that if the "Bermuda Call Option Agreement . . . has economic substance," then "[p]etitioners were entitled to interest deductions that they claimed in 2014-2016." However, other portions of petitioners' Opening Brief might be read to suggest that $29 of the $20,238,527 claimed as an interest-expense deduction is attributable to interest on debt other than the 2014 note. Their Opening Brief explains that "the 2015 Annual Investment Report states OID interest of $20,238,498." Their Opening Brief then asserts that the larger $20,238,527 amount is "comprised *almost* entirely of the interest associated with the hedge transaction." (Emphasis added.) To the extent these portions of petitioners' Opening Brief can be interpreted as implicitly suggesting that the $29 difference between the $20,238,527 claimed amount and the $20,238,498 amount reported on MVP's annual investment report is interest on some debt other than the 2014 note, petitioners have supplied no argument, and adduced no evidence, that the $29 amount is deductible. We thus do not consider the argument.

- *Tax year 2016*.   Of the $7,808,184 that SLS claimed as interest-expense deductions on its 2016 return, respondent disallowed $7,808,135 (i.e., all but $49 of the claimed amount) in the first Notice of Deficiency. Petitioners' Opening Brief concedes that the disallowed amount—$7,808,135—corresponds to interest allegedly accruing on the 2016 note. Thus, the deductibility of this amount hinges on whether the 2016 note is true indebtedness. We need not address the $49 of interest-expense deductions on SLS's return that were not disallowed by the Notice of Deficiency.

III.   *In considering whether the 2014 and 2016 notes are true indebtedness, we need not analyze the operation of the provisions of the 2014 note and the 2014 option agreement.*

Our ultimate conclusions so far regarding the operation of the 2014 and 2016 notes can be summarized thus:

**[\*36]** · *2014 note.* We have not made any conclusions about the operation of the 2014 note, including how it operates with respect to the 2014 option agreement or the 2016 option agreement.

· *2016 note.*

    ○ *Physical settlement*: In the event of physical settlement under the 2016 option agreement, the balance on the 2016 note for any exercise date would exactly equal the predetermined payment (i.e., the first component of Bundle.$k$ minus SPRICE.$k$) to be made from Hedge Red to SLS.

    ○ *Cash settlement*:

        ▪ In the event of cash settlement under the 2016 option agreement, the 2016 note would be deemed satisfied pursuant to the terms of the 2016 option agreement.

        ▪ The predetermined portion of the cash payment required to be made by Hedge Red to SLS would essentially be zero.

As outlined above, our conclusions about the operation of 2014 and 2016 notes relate only to the provisions of two contracts: (1) the 2016 note and (2) the 2016 option agreement.[20] However, the accrual of the claimed amounts of interest expense is potentially governed by combinations of four contracts: (1) the 2014 note, (2) the 2014 option agreement, (3) the 2016 note, and (4) the 2016 option agreement. In considering what combination of these four contracts governs the disputed interest expenses, the time during which interest accrued can be divided into four periods:

---

[20] More conclusions about the operation of the 2016 note and the 2016 option agreement are set forth *infra* Part IV.

**[*37]**

| Period | Beginning of period | End of period | Relevant contracts (without considering retroactivity) | |
|---|---|---|---|---|
| | | | Note | Option agreement |
| 1 | Execution of 2014 note and 2014 option agreement (on 8/29/14) | Maturity of 2014 note (on 1/1/16) | 2014 | 2014 |
| 2 | Maturity of 2014 note (on 1/1/16) | Execution of 2016 note (sometime from 6/22/16 to 7/7/16) | 2014 | 2014 |
| 3 | Execution of 2016 note (sometime from 6/22/16 to 7/7/16) | Execution of 2016 option agreement (sometime from 9/28/16 to 10/11/16) | 2016 | 2014 |
| 4 | Execution of 2016 option agreement (sometime from 9/28/16 to 10/11/16) | The last day of the last tax year at issue (12/31/16) | 2016 | 2016 |

For the first period, the governing contracts could be viewed as consisting of the 2014 note and the 2014 option agreement. Both contracts were executed on August 29, 2014. However, we observe that the 2016 option agreement stated that it should be retroactively treated as the "original agreement" on August 29, 2014, which may raise the possibility that the 2014 option agreement should not be considered as governing during this period.

For the second period, the governing contracts could be viewed as consisting of the 2014 note and the 2014 option agreement. The 2014 note had matured at the beginning of this period but had remained unpaid, which may raise the possibility that SLS was still obligated by the terms of the 2014 note even after its maturity. However, we observe that the 2016 note contained a retroactive effective date of January 1, 2016, which may raise the possibility that the 2014 note should not be considered as governing during this period. And, as explained before, the 2016 option agreement stated that it was to be retroactively treated as the "original agreement" on August 29, 2014, which may raise the possibility that the 2014 option agreement should not be considered as governing during this period.

For the third period, the governing contracts appear to be the 2016 note and the 2014 option agreement. However, as noted above, the 2016 option agreement stated that it was to be retroactively treated as

**[\*38]** the "original agreement" on August 29, 2014, which may raise the possibility that the 2014 option agreement should not be considered as governing during this period.

For the fourth period, the governing contracts appear to be the 2016 note and the 2016 option agreement.

We now explain the parties' positions in the context of the four periods of interest accrual defined above.

We begin with respondent's position. Respondent's Opening Brief asserts that "the characteristics of the Loan, together with the PNP component of the option, lead to the conclusion that SLS never incurred genuine indebtedness for tax purposes." This sentence contains three terms of art: "Loan," "PNP," and "option." We discuss each term in turn:

- The "Loan" in the sentence in respondent's Opening Brief is defined as "a 2014 Promissory Note . . . and a 2016 Promissory Note." Respondent explains further: "The exact relationship between these two promissory notes is unclear, but we refer to the general concept of debt ostensibly borrowed by SLS from HR and used to purchase the BCO as the Loan . . . ."

- The term "PNP" in the sentence in respondent's Opening Brief is an abbreviation for "predetermined no-risk payment." Respondent uses PNP in the same sense that Levy used that term. Levy used the term to mean the payment required of Hedge Red by the 2014 and 2016 option agreements other than the amounts that depend on the interest rates exceeding 8% for particular quarters.

- The term "option" in the sentence in respondent's Opening Brief is used to refer to both the option in the 2014 option agreement *and* the option in the 2016 option agreement. Thus, respondent's Opening Brief explains: "There is a 2014 Bermuda Call Option Agreement (2014 BCOA) and an Amended and Restated Bermuda Call Option, executed in 2016 (2016 BCOA). At times, we refer to general concept of a Bermuda Call Option, encompassing both the 2014 and the 2016 BCOAs as the BCOA or the BCO. The BCO was entered into between HR/MVP and SLS." (Record citations omitted.)

In summary, respondent argues that the 2014 and 2016 notes were not debt with respect to any of the four interest-accrual periods

**[*39]** described above but does not specify for each period what combination of contracts governs (as among the 2014 note, the 2014 option agreement, the 2016 note, and the 2016 option agreement).

Petitioners contend that the 2014 and 2016 notes constitute true indebtedness. Petitioners' arguments are threefold: (1) There is a duration-gap scenario under which SLS can call the option provided by the 2016 option agreement without paying down the 2016 note, (2) the 2016 note (when considered with the 2016 option agreement) is analogous to a Formosa bond, and (3) SLS has a profit potential with respect to its right to a payment computed with respect to the second component of Bundle.$k$ in the event of the exercise of the call provided by the 2016 option agreement. In framing their arguments, petitioners do not focus on the operation of the provisions in the 2014 note and the 2014 option agreement. Rather, petitioners (and their expert witnesses) focus on the operation of the provisions of the 2016 note and the 2016 option agreement. For example, Pomerantz mathematically modeled the provisions of the 2016 option agreement but not the 2014 option agreement.

To be sure, petitioners' Opening Brief acknowledges (and summarizes) the provisions of the 2014 note and the 2014 option agreement. *See* Pet'rs' Opening Br. ¶¶ 90–96 (proposing findings of fact regarding 2014 note), 60–89 (proposing findings of fact regarding 2014 option agreement). But neither petitioners nor their expert witnesses explained how the provisions of the 2014 note and the 2014 option agreement operate.

Because petitioners' arguments are detailed only in relation to the operation of the provisions of the 2016 note and the 2016 option agreement, we do not analyze the operation of the provisions of the 2014 note and the 2014 option agreement. The narrowness of our focus can be explained by reference to the framework of the four interest-accrual periods. Essentially petitioners ask us to (1) draw conclusions about the 2016 note and the 2016 option agreement and (2) extend those conclusions to all four interest-accrual periods. But because we do not agree with their conclusions about the 2016 note and the 2016 option agreement (as we explain *infra* Part IV), we need not consider whether it is appropriate to extend these conclusions to all four periods.

**[*40]** IV. *The 2014 and 2016 notes are not true indebtedness.*

In support of the argument that the 2014 and 2016 notes do not constitute true indebtedness, respondent explains that SLS will never pay off the 2016 note except through an offset against the predetermined portion of the payment required of Hedge Red in the event SLS calls the option, the amount of which is a mirror image of the note. We agree with this explanation.

Let us consider what would happen if SLS exercises the option. Hedge Red would have the choice between physical settlement or cash settlement. If Hedge Red elects physical settlement, the predetermined portion of the payment required of Hedge Red would be equal to the amount SLS owes Hedge Red on the 2016 note. The only asset with which Hedge Red can make the predetermined payment is the 2016 note itself. Therefore, in the event of physical settlement, Hedge Red will make the predetermined portion of the payment by releasing the 2016 note. If Hedge Red elects cash settlement, then (1) the amount of the predetermined portion of the payment due from Hedge Red would be zero and (2) the 2016 note would be deemed satisfied.

Apart from the predetermined amount of Hedge Red's liability, Hedge Red would also pay an amount corresponding to the second component of Bundle.$k$. This portion of the payment would be made whether settlement is physical or cash. To fund this payment to SLS, Hedge Red would use the NBC interest-rate cap.

It is also possible that SLS might never exercise the option provided by the 2016 option agreement. If SLS never exercises the option (the last date to do so is October 1, 2044), then the option will expire valueless. The 2016 note will still be due on October 1, 2046, with SLS ostensibly required to make a payment to Hedge Red of $890,339,487, but Hedge Red can collect the 2016 note only against the option, and the option, once expired, would be valueless. The 2016 note therefore will be a nullity if the option expires.

In summary, the 2016 note will inevitably disappear having no effect: (1) If SLS exercises the option and Hedge Red elects physical settlement, Hedge Red will satisfy the predetermined portion of its payment obligation to SLS by releasing the 2016 note, the balance of which would be equal to the predetermined portion, (2) if SLS calls the option and Hedge Red elects cash settlement, the amount of the predetermined portion of Hedge Red's payment obligation will be zero

**[\*41]** and the 2014 note will be deemed satisfied through the operation of the 2016 option agreement, and (3) if SLS never calls the option, the 2016 note will mature with Hedge Red having no right to collect it. We conclude that the 2016 note does not constitute indebtedness within the meaning of section 163. *See Knetsch v. United States*, 364 U.S. 361, 365–66 (1960); *see also BB&T Corp. v. United States*, 523 F.3d 461, 476–77 (4th Cir. 2008).

> A. *The duration-gap scenario, under which SLS will call the option but the 2016 note will remain outstanding, is nonexistent.*

Petitioners contend that SLS may call the option early and leave the 2016 note to mature. Luc Faucheux, an expert witness called by petitioners,[21] refers to this scenario as the "duration gap." Petitioners' contention regarding the duration-gap scenario is the first argument we referred to *supra* Part III.

In the duration-gap scenario, petitioners envision that a rise in the market interest rate would make it profitable for SLS to exercise the call. Petitioners hypothesize that exercise of the call would result in a payment from Hedge Red to SLS and that Hedge Red would invest the predetermined portion of the payment in an investment that would eventually accumulate to a value greater than SLS's liability under the 2016 note. Thus, on October 1, 2046, when the 2016 note matures, SLS would have accrued positive investment returns.

The duration-gap scenario supposes that the 2016 note would continue to exist as SLS's debt after the call had been exercised with SLS no longer having an offsetting right to a predetermined payment from Hedge Red. The duration-gap scenario is thus a way for petitioners to explain why the 2016 note constitutes genuine indebtedness. If it is realistic, the duration-gap scenario would arguably refute our view that the 2016 note would be eliminated if SLS exercises the call option found in the 2016 option agreement.

To demonstrate that the duration-gap scenario is realistic, petitioners rely on Faucheux's testimony. Faucheux illustrated the duration-gap scenario by assuming that the market rate of interest

---

[21] Faucheux is an experienced trader in financial instruments, including options and Formosa bonds. He holds a Ph.D. in physics from Princeton University.

**[\*42]** would rise to 8% and that SLS would exercise the call in the year 2030. Here is Faucheux's explanation of that illustration:

> I detail here a simple estimate of the profit potential at higher rates. The note has one payment of $790m in 2046.
>
> On the other side of the transaction, at each period there will be a value for bundle of bonds minus the strike. The call option exercise decision will be based on that value, and how it compares with the discounted value of the final note payment. I fully disregard here the cap addition, as I am restricting myself to rates being under 8%. My analysis offers no additional benefit from the cap, even though obviously at rates higher than 8% there will be such a benefit. And so my profit analysis is conservative[.]
>
> At a given point in time, I then compare the value of the bonds minus strike to the discounted value of the final note payment, back from the year 2046 to this given point in time.
>
> As an example I picked rates at 8% and the year 2030.
>
> . . . .
>
> In that case the value of $790m paid in 2046 discounted back to 2030 is roughly $250m.
>
> In 2030, using the formula from the confirmation, the value at that point in time of the bonds being delivered minus the strike will be roughly $330m.
>
> If SLS were to exercise their option to receive the bonds, they would show a mark-to-market profit around $80m in 2030.

The duration-gap scenario in Faucheux's illustration would not realistically occur. Were SLS to call the option in 2030 before it paid its own liability to Hedge Red under the 2016 note in 2046, Hedge Red would be unable to pay the predetermined portion of the call payment. It would not have sufficient assets to do so. As Levy explained: "HR cannot give SLS the PNP portion of the BCO at any time unless SLS pays HR the equal mirror image funds SLS owes HR on the Note." Thus, as Levy concluded, there is no duration-gap scenario: "[T]he 'Duration Gap' between the date SLS pays back the Note and the date HR pays SLS for the PNP portion of the BCO can never exist because HR does not have even one thousandth of the money that would be needed to pay off the PNP portion of the BCO to SLS."

We agree with Levy. With physical settlement, Hedge Red would be theoretically required to make a payment (in bonds) to SLS on the

**[\*43]** settlement date. The only way SLS could make the payment would be to release the 2016 note. With cash settlement, the 2016 note would be satisfied by the exercise of the call. This is how section 2.6.2 of the 2016 option agreement would operate, in our view. Thus, with either physical settlement or cash settlement, the 2016 note will be eliminated upon exercise of the option. There is no duration-gap scenario.

The unreality of the duration-gap scenario is confirmed by the way in which Hedge Red was compensated for its participation in the transactions at issue. The duration-gap scenario posits that SLS could force Hedge Red to make a large predetermined payment that would exceed—in present value—the balance on the 2016 note owed by SLS to Hedge Red. But Hedge Red was not compensated for this theoretical risk at the outset of its transactions with SLS. Hedge Red received $609,000 from SLS. But this was compensation for the interest-rate-cap component of the 2014 and 2016 option agreements. It was not compensation for Hedge Red's risk of loss due to the possibility of a duration gap. Hedge Red also received $36,000 for arranging the transaction. But neither was this compensation for Hedge Red's risk of loss due to the possibility of a duration gap. That Hedge Red was not compensated for the losses it would suffer in the event of a duration-gap scenario supports our view that there is no such duration-gap scenario.

Furthermore, none of the contemporaneous documentation mentions the duration-gap scenario. Various documents were written by the employees and advisors of SLS and Hedge Red concerning the economics of the transaction between those two entities. These documents included spreadsheets, emails, and the Rubinger tax opinion letter. These documents do not mention the duration-gap scenario. The absence suggests that the duration-gap scenario is merely a post hoc attempt by Faucheux to rationalize the transaction.

B.   *Petitioners' comparison to a Formosa bond does not convince us that there exists a duration-gap scenario.*

In an attempt to buttress their view that the duration-gap scenario is realistic, petitioners analogize the 2016 note (combined with the 2016 option agreement) to a Formosa bond. This analogy is the second argument by petitioners that we referred to *supra* Part III. To bring home the analogy to a Formosa bond, petitioners again rely on Faucheux's testimony. Faucheux has extensive experience trading

[*44] Formosa bonds. A Formosa bond has a fixed interest rate, it has no coupons, and it is cancelable.

Faucheux first explained the risk features of a noncancelable bond with a fixed interest rate. If the market interest rate rises, the borrower will be better off under time-value-of-money principles. And if the market interest rate falls, the borrower will be worse off under time-value-of-money principles. This is so because, as the market rate of interest falls, there is an increase in the present value of the borrower's future obligations to pay interest and principal.

Faucheux then explained the significance of modifying a fixed-rate bond by making it cancelable by the borrower. With a cancelable bond, the borrower is insulated from the risk of a fall in the market interest rate. If the market interest rate were to fall, thus increasing the present value of the borrower's future obligations to pay interest and principal on the bond, the borrower could simply cancel the bond.

Faucheux next explained that a Formosa bond is a specific type of fixed-rate cancelable bond in which there are no interest payments (also known as "coupons") until maturity.

Faucheux then opined that the 2016 note (combined with the 2016 option agreement) constituted a Formosa bond.

In our view, a Formosa bond is not analogous to the 2016 note. As Levy explained, an actual Formosa bond involves the transfer of funds from a lender to a borrower. The borrower can then invest the loan proceeds. But SLS could use the proceeds of the 2016 note for only one purpose: to purchase a call option, the exercise of which would require Hedge Red to make a predetermined payment that would eliminate the 2016 note. Therefore, the 2016 note is not analogous to a Formosa bond. Although a Formosa bond will be canceled by the borrower if the market rate of interest falls low enough, cancellation is not inevitable.

      C.    *The portion of the 2016 option agreement that models an interest-rate cap does not make the 2016 note true indebtedness.*

Petitioners' next argument is that the second component of Bundle.$k$ in the 2016 option agreement, which models an interest-rate cap, has an upside potential to SLS. This is the third of petitioners' arguments we described *supra* Part III.

**[\*45]** SLS paid Hedge Red \$609,000 in cash to compensate Hedge Red for the interest-rate cap component of the 2016 option agreement. Pomerantz explained that there was upside potential to SLS from this component. The value of the component would increase if there was an increase in the market rate of interest or its volatility. Pomerantz explained that, taking this into account, the interest-rate cap component of the 2016 option agreement was fairly priced at \$609,000.

We agree with Pomerantz that the interest-rate-cap component of the 2016 option agreement is valuable to SLS and that \$609,000 was a fair price for it. In our view, this does not establish the genuineness of the debt embodied by the 2016 note. The interest-rate-cap component was not purchased with the proceeds of the 2016 note. Rather, the 2016 note financed SLS's right to receive a predetermined payment from SLS that would offset the 2016 note. Therefore, the upside potential of the interest-rate-cap component does not imbue the 2016 note with the qualities of true indebtedness.

V.    *Petitioners are liable for penalties.*

      A.    *Petitioners were negligent with respect to the underpayments for 2014, 2015, and 2016 and did not have reasonable cause for claiming the disputed interest deductions.*

For tax year 2013 respondent contends that petitioners are liable for the section 6676(a) excessive-refund-claim penalty. Section 6676(a) imposes a 20% penalty on a taxpayer who makes a claim for refund for an excessive amount "unless it is shown that the claim for such excessive amount is due to reasonable cause." An excessive amount is defined as the amount by which the amount of the claim for refund exceeds the allowable amount of the claim. § 6676(b).

For tax years 2014, 2015, and 2016 respondent contends that petitioners are liable for section 6662(a) accuracy-related penalties under section 6662(b)(1). Section 6662(a) imposes a penalty equal to 20% of the portion of an underpayment to which section 6662 applies. Section 6662(b)(1) provides that section 6662 applies to the portion of an underpayment attributable to negligence or disregard of rules and regulations. Negligence is defined by Treasury Regulation § 1.6662-3(b)(1) as including "any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Under

**[\*46]** Treasury Regulation § 1.6662-3(b)(1)(ii), negligence is "strongly indicated" when the taxpayer "fails to make a reasonable attempt to ascertain the correctness of a deduction . . . on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances."

Section 6664(c)(1) provides that no penalty is imposed under section 6662 "with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Treasury Regulation § 1.6664-4(b)(1) provides that the most important factor in determining whether a taxpayer acted with reasonable cause and in good faith is the "extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Treasury Regulation § 1.6664-4(b)(1) provides that reliance on professional advice may constitute reasonable cause and good faith if such reliance is reasonable and the taxpayer acted in good faith. Treasury Regulation § 1.6664-4(c)(1) characterizes that inquiry as whether a "taxpayer has reasonably relied in good faith on . . . the opinion of a professional tax advisor . . . as to the treatment of the taxpayer (or any entity, plan, or arrangement) under Federal tax law."

Petitioners contend they are not liable for penalties under sections 6676(a) and 6662(a) because they "relied on Mr. Rubinger as a tax professional," their "reliance was reasonable," and their "reliance was in good faith."

Petitioners' liability for the section 6662(a) penalties is predicated on the theory that they were negligent in claiming deductions for interest on the 2014 note and the 2016 note. Section 7491(c) provides that the IRS shall have the burden of production with respect to the liability of any individual for a penalty. Therefore, respondent has the burden of producing evidence that petitioners were negligent in claiming the interest deductions. *See Carlebach v. Commissioner*, 139 T.C. 1, 16 (2012). To meet this burden, the IRS introduced evidence showing that petitioners commissioned the tax opinion letter to protect themselves from penalties rather than to comply with the tax law. The evidence also showed that, knowing that Rubinger did not stand behind that opinion letter, they claimed the deductions anyway. Securing the tax opinion letter was therefore not a "reasonable attempt" to comply with the Code. *See* Treas. Reg. § 1.6662-3(b)(1). Furthermore, respondent has produced evidence that petitioners should have known that the tax benefits claimed were "too good to be true." *See* Treas. Reg. § 1.6662-3(b)(1)(ii). The economic cost to petitioners of the relevant transactions

[*47] was limited to the $890,000 cash payment.[22]  But petitioners claimed millions of dollars of deductions: Over $6 million for 2014, over $20 million for 2015, and over $7 million for 2016.  These tax benefits are too good to be true.  Respondent has produced evidence the underpayments were attributable to negligence, and petitioners have failed to persuade us they were not.  We hold that the underpayments for these years were attributable to negligence.

Petitioners have the burden of persuasion with respect to establishing reasonable cause and good faith under section 6664(c)(1).  *See Carlebach*, 139 T.C. at 16.  Petitioners have not met their burden.  Soliciting Rubinger's tax opinion letter was designed to protect petitioners from penalties, not to assess their "proper tax liability."  *See* Treasury Regulation § 1.6664-4(b)(1).  Petitioners did not rely on the letter as to the "treatment" of the 2014 note under "Federal tax law."  *See id.* para. (c)(1).  Therefore, we conclude that petitioners did not have reasonable cause for claiming the disputed interest deductions and that they did not act in good faith with respect to the deductions.

Likewise, as to section 6676(a), petitioners have not proven that they had reasonable cause for the excessive amount of their refund claim for tax year 2013.  The issuance of the tax opinion letter did not make it reasonable for petitioners to file the Form 1040X, which was predicated on the validity of the interest deductions.  Although the tax opinion letter attested to the validity of the deductions, petitioners knew when they filed the Form 1040X that Rubinger did not stand behind the letter.  Furthermore, petitioners should have known that the claimed interest deductions were too good to be true given the gross disparity between the (1) amounts of the interest deductions and the (2) economic cost of the transactions.

B.    *The penalties were approved in writing by the appropriate supervisor.*

Section 6751(b)(1) requires that the "initial determination" of a penalty assessment be "personally approved (in writing) by the immediate supervisor" of the person making that determination.  In *Clay v. Commissioner*, 152 T.C. 223, 249–50 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021), we held that a supervisor's approval is timely only if it is obtained before the IRS formally communicates to the taxpayer that penalties will be asserted.  But the U.S. Court of Appeals for the Ninth

---

[22] Or $930,000 if one includes Gopman's agreed-upon fee.

**[\*48]** Circuit in *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1072 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020), rejected our position in *Clay*. The Ninth Circuit held that, in a case involving an assessable penalty, which is not subject to deficiency procedures, written supervisor approval need only be obtained "before the assessment of the penalty or, if earlier, before the relevant supervisor loses discretion whether to approve the penalty assessment." *Id.* at 1074. The Ninth Circuit explained that for penalties subject to deficiency procedures, the Commissioner may lose discretion to approve assessment once the notice of deficiency is issued. *Id.* at 1071 & n.4. In *Kraske v. Commissioner*, 161 T.C. 104, 111 (2023), we held that for cases appealable to the Ninth Circuit (such as this one), the holding in *Laidlaw's Harley Davidson Sales* should be read to encompass penalties subject to deficiency procedures. *See* § 7482(b)(1)(A); *Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). This meant that such penalties (which include the section 6676(a) penalty and the section 6662(a) penalty) could be approved by a supervisor before the penalties were formally communicated to the taxpayer if the approval took place while the supervisor had the discretion to approve the penalties. *Kraske*, 161 T.C. at 110–11.

Respondent bears the burden of producing evidence that the penalties were approved in writing by the appropriate supervisor. *See* § 7491(c); *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). This is an exception to the usual rule that the taxpayer bears the burden of proof. *See Estate of Gilford*, 88 T.C. at 51 (stating that the burden of proof consists of both the burden of production and the burden of persuasion).

1. *The initial determination to impose the penalties was made by Battaglino.*

Petitioners contend that the revenue agent who initially determined to impose the penalties was Peter Orth. If true, this would mean that the relevant supervisor did not approve the penalties. Orth's supervisor did not approve any determination to impose the penalties.

We are persuaded that the initial determination to impose the penalties was made by Battaglino. Orth did much of the work during the examination, including much of the work on certain aspects of the penalties. But the initial determination to impose penalties was made by Battaglino. This conclusion is supported by the fact that his name appears on the penalty approval forms. The conclusion is further

[*49] supported by the testimony of Battaglino and Orth. They credibly testified that the initial determination was made by Battaglino, not Orth.

> 2. *The approval of the penalties by Battaglino's supervisor, Biggerstaff, was timely, even though it occurred after the Letter 5153, because it occurred before the Notices of Deficiency while Biggerstaff still had discretion to approve the penalties.*

On October 19, 2018, Battaglino's determination was approved in writing by Biggerstaff, who was Battaglino's supervisor. Petitioners contend that even if it were Battaglino who had made the initial determination to impose the penalties, the determination was approved too late by Battaglino's supervisor, Biggerstaff. Petitioners contend that the first formal communication of the penalties was the Letter 5153, dated May 17, 2018.[23] They contend that Biggerstaff's approvals, on October 19, 2018, were five months too late under our opinion in *Clay*, 152 T.C. at 249–50. In *Clay* we held that supervisor approval is timely only if it is made before a formal communication to the taxpayer that penalties will be asserted. *Id.* But the Ninth Circuit in *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th at 1072, rejected our position in *Clay* that supervisor approval must be made before the first formal communication to the taxpayer. Instead, the Ninth Circuit held that approval before assessment is timely if the supervisor retains discretion to give or withhold approval of the initial determination when the supervisor gives approval. *Id.* at 1072, 1074. As an example of this qualifier, the Ninth Circuit explained that, in the case of penalties subject to deficiency procedures, a deadline for supervisor approval earlier than just before assessment might be required because a supervisor may lose discretion to approve a penalty once a notice of deficiency is sent. *Id.* at 1071 & n.4. On October 19, 2018, Biggerstaff approved Battaglino's initial determination to assert the penalties. This was well before the Notices of Deficiency were mailed on November 22, 2019. Biggerstaff still retained discretion to give his approval of the penalties on the day he approved them. This case is appealable to the Ninth Circuit, and therefore we follow the Ninth Circuit's view. *See*

---

[23] We note that the Letter 5153 actually discusses only the tax years 2014, 2015, and 2016, and penalties for those years. The letter does not discuss tax year 2013 and the penalty for that year.

**[\*50]** *Kraske*, 161 T.C. at 108–11. We hold the penalties at issue in this case were supervisor approved pursuant to section 6751(b).

Petitioners are liable for the penalties.

To reflect the foregoing,

*An appropriate order will be issued, and decision will be entered under Rule 155.*